Date signed March 11, 2014



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at GREENBELT

| | |
|---|---|
| In Re: | |
| Neogenix Oncology, Inc. | Case No.    12-23557-TJC |
| Debtor | Chapter    11 |

## <u>MEMORANDUM OF DECISION</u>

Debtor Neogenix Oncology, Inc. ("Neogenix" or the "Debtor"), with the support of the

Official Committee of Equity Security Holders (the "Committee"), seeks confirmation of its plan

of liquidation.  Judy A. Robbins, the United States Trustee ("UST"), objects to confirmation.

The court previously ruled that the Debtor established all elements for confirmation under 11

U.S.C. §1129(a)[1] with the exception of the two issues addressed herein: (1) whether the plan

meets the requirements of §1129(a)(10), which requires that if any class of creditors is impaired

under a plan, at least one class of creditors must approve the plan without regard to the votes of

insiders; and (2) whether the plan can be confirmed with the third party release and exculpation

provisions.  The court concludes that the plan meets the requirement of §1129(a)(10), but further

concludes that the third party release provisions cannot be approved under applicable law, and

will deny confirmation of the plan as drafted.

---

[1]  All references to statutory sections are to the United States Bankruptcy Code found at 11 U.S.C. §§101, *et seq.*, unless otherwise noted.

The court has subject matter jurisdiction over approval of the confirmation of the plan pursuant to 28 U.S.C. §§157 and 1334.  The confirmation of a chapter 11 plan is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(L).

## Findings of Fact

***The Debtor and the §363 Sale.***

Neogenix is a Maryland corporation founded in 2003 as a biotechnology company that developed therapeutic and diagnostic products in the early detection and treatment of cancer.  At the time it filed its petition on July 23, 2012, Neogenix was in the pre-revenue stage; it generated funds almost exclusively from grants and the sale of its common stock, rather than from product sales or operations.

In 2011, Neogenix's management team learned that prior management and prior counsel had authorized Neogenix to pay finders' fees to unlicensed or unregistered individuals who raised capital for Neogenix.  In October 2011, Neogenix received a letter of inquiry from the U.S. Securities and Exchange Commission.[2]  The letter requested that Neogenix provide information about the finders' fee payments.  Neogenix provided the information requested by the SEC and, by all accounts, has cooperated with the SEC in its investigation.

Neogenix determined that, due to the practice of payment of finders' fees, some investors may have the right to seek to rescind their stock purchases and require Neogenix to return their investment.  Neogenix's management assessed this risk and determined that it is "reasonably possible" that some shareholders may have rescission rights.  As of July 10, 2012, the range of potential liability for rescission was approximately $0 to $31 million.  In fact, Neogenix received

---

[2]  Although Neogenix's stock was not traded on any exchange, due to the number of shareholders it is a public reporting company under the Securities Exchange Act of 1934, and it makes periodic filings with the Securities and Exchange Commission ("SEC").

several shareholder claims for rescission totaling an estimated $1.4 million. However, no rescission litigation against Neogenix has been initiated.

The potential rescission liability jeopardized Neogenix's on-going business because of the possibility that it might need to rescind stock purchases or pay damages. It also had a chilling effect on Neogenix's ability to raise capital. Neogenix appointed a committee to consider available financial alternatives. By March 2012, Neogenix hired Piper Jaffray & Co., to investigate its options to raise capital, or alternatively, search for a buyer. Piper Jaffray conducted a prepetition marketing process and contacted fifty-nine potentially interested parties, but only one party, Precision Biologics, Inc. ("PB") submitted a bid for Neogenix's operating assets. PB is a corporation that was formed specifically to purchase Neogenix's assets, and it was initially owned and managed by Stanley B. Archibald, Jr., who is a shareholder of Neogenix and was also a former Neogenix board member.[3] In early February 2012, Archibald resigned and worked on raising capital to purchase Neogenix's operating assets. With the financial support he generated, Archibald formed PB with the goal of purchasing Neogenix.

PB and Neogenix commenced negotiating a potential sale of Neogenix's assets in May 2012. The sale of Neogenix's assets to PB was intended to, among other things, provide Neogenix shareholders with an ownership stake in the success of its medical technology.

Neogenix and PB entered into a nonbinding letter of intent in June 2012, and then negotiated the terms of an Asset Purchase Agreement, a bridge loan, and a debtor-in-possession financing facility. An ad hoc committee of Neogenix's seven largest shareholders, who were not involved in Neogenix's management and were not owners of PB, helped review and evaluate the proposed purchase. Neogenix continued to consult with the ad hoc committee about the sale to PB and about the bankruptcy filing through the petition date.

---

[3]  Archibald served seven months as a board member from June 2011 until early February 2012.

Neogenix filed for chapter 11 relief on July 23, 2012.  On August 7, 2012, the U.S.

Trustee appointed seven Neogenix shareholders to serve on the Committee.  Two members of

the Committee were members of the ad hoc committee, which was disbanded after the

Committee was appointed.  The Committee retained the law firm of Sands Anderson to serve as

its counsel.

The court approved Neogenix's bid procedures for sale of its assets by an order entered

on August 21, 2012.  Piper Jaffray re-contacted the original fifty-nine bidders that were

identified pre-petition, along with twenty others.  Other than PB, there was only one other

interested bidder.  However, that other interested bidder declined to submit a qualifying bid.

Thus, PB was deemed to be the successful bidder.  After notice and a hearing, the court

entered a final order approving the sale to PB on September 20, 2013, and the sale closed on

September 24, 2012.  PB paid Neogenix $3,965,000.00, minus a credit of $1,172,525.37

(representing a payoff of the DIP financing facility) for all of Neogenix's assets.  The remaining

$2,792,474.63 went to Neogenix, and PB issued Neogenix 5.5 million shares of PB stock (the

"PB Stock") to be distributed pro rata to Neogenix's shareholders pursuant to a confirmed plan.

Contingent cash, in the amount of $730,000, was also lent to Neogenix, pursuant to the terms of

the APA.  The only assets that Neogenix maintained were its potential causes of action.

Since the filing of the case, Neogenix's directors have not been paid any compensation

and officers have not received any compensation after the sale closed to PB.

***Plan Provisions.***

Neogenix, in consultation with the Committee, developed a chapter 11 plan of

liquidation.  Ultimately, Neogenix filed an amended disclosure statement, which was approved

by the court, and the First Amended Plan of Liquidation (the "Plan").  Docket Nos. 280-81.  The

court held a confirmation hearing on May 3, 2013, at which it concluded that all elements of §1129(a) were met for confirmation other than the two issues discussed herein. The parties subsequently filed post-hearing briefs on the two outstanding issues described above.

The Plan provides full payment of unsecured claims and a significant distribution to interest holders. Under the Plan, the PB Stock, which has been held in a liquidating trust since the sale closed, will be distributed to the equity holders shortly after the effective date, and any causes of action will be transferred to the liquidating trust, with the net proceeds from successful causes of action also transferred to Neogenix's shareholders. The Plan also provides for the termination of the stock interests in Neogenix, and the dissolution of Neogenix.

Specifically, the Plan authorizes the full payment of allowed administrative claims and allowed priority tax claims. Secured claims, non-tax priority claims, and general unsecured claims, comprising Classes 1, 2, and 4 respectively, will be paid in full, and are deemed unimpaired and to have accepted the Plan. *See* §1126(f). The only class of claims that did not receive nor retain any property is Class 6, holders of unexercised stock options.[4] As specified in the Plan, Class 6 was deemed to have rejected the Plan and was not entitled to vote. *Id.* at §1126(g).

The voting and impaired classes consist of Classes 3 and 5. Class 3 consists of thirteen former and current directors and officers, each of whom timely filed a proof of claim for contingent, unliquidated, and unsecured claims for indemnification.[5] The claims are asserted pursuant to indemnification agreements, Neogenix's articles of incorporation, Neogenix's

---

[4] The exercise price of the unexercised stock options is far higher than the value of the underlying shares. Thus, the options are underwater and worthless. All Class 6 members received notice of a deadline for filing proofs of interest, and only two option holders filed a proof of interest. The unexercised stock options of the other members that did not file proofs of interest were extinguished.

[5] As will be discussed further, four members of Class 3 ceased being an officer or director by November 2012, at the latest: Stanley B. Archibald, Jr., Dennis Greene, Theodore T. Sorenson and Robert Washington. The remaining nine members of Class 3 remained officers or directors when the case was filed.

bylaws, and applicable state law.  No one disputes that the Class 3 members hold valid indemnification rights against the Debtor.

Class 5 consists of "Interests in the Debtor for shares of the Debtor's Common Stock owned by any Shareholder, including Potential Shareholder Rescission Claims."  Plan at 27; Am. Discl. at 51.  Shareholder, as defined in the Plan, means a holder of the Debtor's common stock.

Mr. Christopher Hyun, a member of the Committee, testified[6] that the Committee was actively engaged during the bankruptcy process and routinely provided input on behalf of its constituents to Neogenix on all major decisions.  The Committee and its professionals were significantly involved in negotiations regarding the auction process for Neogenix's assets, the sale of those assets, and the drafting and formation of the Plan and the amended disclosure statement.  In the Committee's view, the sale maximized the value of the assets with the PB Stock and other assets to be distributed to the interest holders through a confirmed liquidating plan.

To address the officer and director claims and the resolution of the indemnity provisions, the Committee conducted an analysis and investigation of the potential causes of action against officers and directors and others.  This due diligence commenced with the submission of document and information requests to Neogenix and its professionals.  Specifically, the Committee reviewed all the Board of Director's minutes from inception and the applicable insurance policies, as well as the term, coverage, scope, and limits of those policies.  In its examination, the Committee learned that Neogenix's liability was spread out through a tower of insurance policies and through tail coverage.  The Committee interviewed corporate and bankruptcy counsel.  It also looked into the roles of previous board members, audit firms,

---

[6] His testimony was submitted by proffer at the Plan confirmation hearing, without objection.

officers, staff, agents, the SEC inquiry, Neogenix's response to the SEC inquiry, former counsel, the Board's statutory immunity, and the diluted stock. Certain officers were also interviewed about the board's knowledge of the lawfulness of the finders' fees and their monitoring of fund raising.

The Committee concluded that certain former officers and directors, and others, face liability for the problems faced by Neogenix. Claims against those parties are preserved in the Plan. The Committee, however, concluded that providing a third party release to the thirteen members of Class 3 was warranted based on its investigation and would greatly facilitate the distribution of the PB Stock and remaining assets to the equity holders.

The third party release and exculpation provisions in the Plan are contained in Article 10. As pertinent here, Article 10.C.3. contains a third party release of the Class 3 members for all acts or omissions prior to the effective date by the Class 5 members (the "Release Provision").[7] Article 10.C.1. contains an exculpation of Released Parties[8] for acts or omissions relating to the preparation and administration of this case (the "Exculpation Provision"). An exception to the Exculpation Provision exists for gross negligence, willful misconduct, and any potential claims by the SEC. The Plan also includes an injunction that bars third parties from seeking relief against the Class 3 members and the Released Parties (Plan at Article 10.C.5.), and it requires the liquidating trust to indemnify the Released Parties and the Class 3 members if a person violates the injunction by suing them (Plan at Article 10.E.). Any indemnification payment can be made

[7] As drafted, the Plan language would include a release of the Class 3 members by former shareholder as well as Class 5 members. *See* Plan, 10.C.3(providing a release from "each Person …that has held . . .  any Interest….") This Memorandum addresses the release provision only as it applies to the Class 5 members because there is nothing in the record that would justify allowing the release by former shareholders. They are not included in Class 5, are not parties to the case, were not provided notice of the releases, and receive nothing under the Plan.
[8] As defined in the Plan, Article 1.B.1.111, Released Parties means (i) the Directors and Officers of the Debtor as of the Petition Date and up to an through the Effective Date, (ii) any member of the Official Committee, solely in its capacity as a member of the Official Committee and not in any other capacity, (iii) Precision Biologics, and (iv) any of the representatives, agents, officers, directors, employees, professionals, advisors or attorneys of the foregoing or of the Debtor. Docket No. 281 at 20.

only after all other claims have been paid by the liquidating trust, as well as all fees and expenses of the liquidating trust. Stated otherwise, an indemnification payment can be made before a distribution is made to equity holders but only after all other claims and expenses are paid.

The Committee endorses the Plan. It also sent the Class 5 members a letter in support of the Plan, stating as follows:

> The Official Committee's decision to support the Plan was made after carefully considering several factors, including, among other things, the release, exculpation and injunction provisions embodied in the Plan. The Official Committee has conducted a thorough due diligence review of, among other things, potential causes of action, the proposed releases to past and present directors and officers of Neogenix, insurance coverage, and the impact of the releases and exculpation on the same. Upon concluding its due diligence review, the Official Committee has determined that it is appropriate to support the Plan and to provide this letter in support of the Plan.

Official Committee's Plan Support Letter, March 21, 2013 (Docket No. 310-1).

All thirteen members of Class 3 voted to accept the Plan. Class 5 voted overwhelmingly to accept the Plan. Specifically, 261 of the 273 voting Class 5 members, 95.60% of the voting members, voted in favor of the Plan. Further, according to the tally of ballots, 13,687,227 of the 13,743,560 voting shares (or 99.59%) voted to accept the Plan and 56,333 of 13,743,560 voting shares (or .41%) voted to reject the Plan. No Class 5 member filed an objection to the Plan or objects to the Release and Exculpation Provisions. No party, including the UST, has asserted that valuable claims exist against the Class 3 members.

### Conclusions of Law

As stated earlier, the UST objects to the Plan on two grounds: the Plan fails to meet the requirements of §1129(a)(10) and the Plan cannot be confirmed with the Release and Exculpation Provisions. The UST files her objection pursuant to her statutory obligation to supervise the administration of chapter 11 cases including, in particular, filing comments on

plans and disclosure statements.  28 U.S.C. §586(a)(3)(B).  The court will address each issue in turn.

***Section 1129(a)(10).***

Section 1129 sets forth the substantive requirements for confirmation of a chapter 11 plan.  One requirement is that, if any class is impaired, an impaired class of creditors must vote to accept the plan, without including the votes of insiders:

> If a class of claim is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. §1129(a)(10).  Here, Class 3 is the only class of impaired claims entitled to vote on the Plan.  All members of Class 3 voted in favor of confirmation.  The UST contends, however, that all Class 3 members are insiders because the determination of whether a class member is an insider should be made when the claim arose, and all Class 3 members were officers or directors at that time.  The Debtor contends that the relevant period for determining when a Class 3 member is an insider is at the time the Plan was developed or voting occurred, and further contends that four members were not insiders at those times.[9]  The court concludes that, for purposes of §1129(a)(10), the relevant time for determining when the claimholder is an insider is when the Plan was developed or when voting occurred, and at least two of the Class 3 members were not insiders at that time.  Therefore, the Plan meets the requirements of §1129(a)(10).

The Bankruptcy Code provides a non-exhaustive definition of the term "insider."  11 U.S.C. §101(31).  *See Butler v. David Shaw Inc.,* 72 F.3d 437, 443 (4th Cir. 1996).  Where the person or entity does not fit within one of the statutorily listed categories, the inquiry becomes fact intensive, and the insider determination hinges on the closeness of the relationship between

---

[9] The plan proponent bears the burden of establishing that each requirement set forth in §1129 has been met by a preponderance of the evidence.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1165 (5th Cir. 1993).

the parties and whether their dealings are at arm's length. *In re Three Flint Hill Ltd. P'ship*, 213 B.R. 292, 298 (D. Md. 1997). Ultimately, "an insider may be any person or entity whose relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny." *Butler*, 72 F.3d at 443.

By express terms of §101(31)(B), if the debtor is a corporation, the definition includes "(i) a director of the debtor; (ii) an officer of the debtor: or (iii) a person in control of the debtor . . . ." 11 U.S.C. §101(31)(B)(i)-(iii). A current officer or director is an insider of a debtor corporation by virtue of that position alone:

> The Bankruptcy Code defines an "insider" to be, among others, a director of the debtor, an officer of the debtor, or a person in control of the debtor. 11 U.S.C. §101(31)(B)(i)-(iii). It is unnecessary for a court to determine whether an individual is both a director and a person in control, or both an officer and a person in control, as the statutory definition is clearly stated in the disjunctive. A defendant's status as a director or an officer is alone sufficient to establish that he is an insider.

*In re Public Access Technology.com, Inc.*, 307 B.R. 500, 505-06 (E.D. Va. 2004). Thus, there is no question that those Class 3 members that were officers or directors when they voted in favor of the Plan were insiders, and no further inquiry is required as to them.

Four members of Class 3 were no longer officers or directors when the case was filed or when voting occurred.[10] The UST argues that the court should consider whether these Class 3 members were insiders "at the relevant period." She argues that the Class 3 members' indemnification rights arose when they were insiders, and they are entitled to vote only because of their status as former officers or directors. She argues, therefore, that because all Class 3 members were officers or directors when their claims arose, they are insiders for purposes of §1129(a)(10) even if they were no longer insiders when voting occurred. The UST cites no

---

[10] The Debtor contends that Gillian M. Sorensen, in her capacity as executor of the estate of the late Theodore Sorensen, Dennis Greene, Stanley B. Archibald, Jr., and Robert Washington are not insiders.

authority for the position that the relevant period for purposes of §1129(a)(10) is when the claim

arose, rather than when the plan was developed or voting occurred.[11]  The court disagrees with

the position of the UST.

Section 1129(a)(10) requires that an impaired class has accepted the plan, without

including "any acceptance of the plan by an insider."  11 U.S.C. §1129(a)(10).  Acceptance of

the plan is governed by §1126.  A class of claims accepts the plan if the plan has been accepted

by creditors that hold at least two-thirds in amount and more than one-half in number of allowed

claims of creditors "that have accepted or rejected such plan."  §1126(c).  Thus, as pertinent here,

the relevant time for making the determination of whether the class member is an insider is when

the member "has accepted" the plan.  In this case, that occurred when the Class 3 members voted

to accept the Plan or, at the earliest, when the Plan was developed.[12]

This view is also consistent with the rationale behind §1129(a)(10).  Insider votes are

excluded

> to nullify the voting of a creditor who is so beholden to, or controlled by,
> the debtor as to be effectively an alter ego of the debtor.  *In re Gilbert*, 104
> B.R. 206 (Bankr. W.D. Mo. 1989).  Where there is an affinity of interests
> between a creditor and the debtor, that creditor is less likely to cast a vote

---

[11] The UST relies on two preference cases in support of her position.  In *In re Public Access Technology.com, Inc.*, the court simply looked to whether the recipient of alleged preference payments was an insider when the payments were made.  307 B.R. at 505.  Whereas *In re GTCR Golder Rauner, L.L.C.*, 351 B.R. 708, 712 (D. Ariz. 2006), the court recognized that the relevant period in a preference case could be when the recipient made arrangements to make the transfer, even if he or she resigned prior to the actual transfer.  *Id*.  The issue arose in the context of interpreting the phrase "at the time of such transfer" in §547(b)(4)(B).  The court recognized that a strict reading of the phrase could result in a situation where "an insider put[s] together a transfer for himself, formally resigned, and then a minute later received the monetary benefits from the deal he had made while an insider . . . ."  *Id*. (quotation omitted).  The court concluded that the phrase "at the time of such transfer" in §547(b)(4)(B) was broad enough to include the time the insider planned to make the transfer, even if he or she subsequently resigned before the actual transfer was made.  Nothing in these cases supports the proposition that the time to consider insider status for purpose of §1129(a)(10) is when the claim arose.

[12] As the Debtor points out, it may be appropriate to consider the relevant time period for §1129(a)(10) purposes to be when a  plan is developed or filed, as opposed to when actual voting occurred, since an insider could influence the plan provisions and  "accept" those provisions, at least informally.  However, as will be discussed further below, a number of Class 3 members ceased being insiders well before the bankruptcy case was filed and long before the Plan was developed.  Therefore, this issue need not be addressed.

> formed on an independent judgment of what will best serve his interests, much less those of his fellow class members.  *Id.*

*In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 798 (Bankr. M.D.N.C. 1995).  This rationale does not apply where a vote is cast by a former insider who is no longer sufficiently connected with a debtor to be an insider, and who is therefore motivated only by his or her status as a claimant in the case.

Further, the difficulty with the UST's position is made manifest when one considers an insider who acquires noninsider claims for the purposes of controlling a class of creditors.  It seems inconceivable that a court would conclude that an insider's votes on the acquired claims circumvented §1129(a)(10) because the acquired claims were held by noninsiders when they arose.  Thus, the UST's position would require one reading of §1129(a)(10) for former insiders, and another for current insiders.

A number of courts have held that, for purposes of  §1129(a)(10), the relevant time period for determining insider status with respect to voting on a plan is at the time the vote is cast.  *See In re Mcorp. Fin. Inc.*, 137 B.R. 219, 232 (Bankr. S.D. Tex. 1992) ("[T]he determination of insider status is made at the time the vote is taken, not at the time the claim arises."); *In re Featherworks Corp.*, 25 B.R. 634, 640 (Bankr. E.D.N.Y. 1982) ("[T]his Court is persuaded that what determines the right to vote is the status of the creditor at the time the vote is taken, not at the time the debt arises."); *In re 455 CPW Assocs.*, 225 F.3d 645, 2000 WL 1340569 (2d Cir. 2000) (unpublished summary order) (finding a vice president of a limited partner of a debtor was not an "insider" at the time he voted on the plan).

In this case, four Class 3 members were no longer directors or officers when the Plan was developed or voting occurred.  Therefore, they do not meet the statutory definition of insider in §103(31)(B)(i) and (ii).

The court turns to the question of whether their "relationship with the debtor is sufficiently close so as to subject the relationship to careful scrutiny." *Butler*, 72 F.3d at 443. That question can be readily resolved at least with respect to two Class 3 members. Gillian M. Sorensen is a member of Class 3 in her capacity as executor of the estate of Theodore Sorensen. Theodore Sorensen served as a "non-executive" Vice-Chairman of the Debtor's Board from 2008-2010. Docket No. 332-1 at 2. He died on October 31, 2010, two years prior to the bankruptcy petition and before the Debtor was even contemplating bankruptcy. Gillian Sorensen, his wife, became the personal representative of his estate. Neither Ms. Sorenson nor the estate of Theodore Sorenson is alleged to have had any involvement in the bankruptcy case or the development of the Plan. Ms. Sorenson, in either her personal capacity or her capacity as estate executor, has not been asked to provide, and has not provided, advice or opinions on any matter concerning the Debtor. Accordingly, Mr. Sorenson ceased being a statutorily defined insider upon his death in 2010, and the evidence establishes that neither his estate nor Ms. Sorenson is sufficiently connected with the Debtor to lead to the conclusion that they were insiders when the Plan was developed or voting occurred.

The court reaches a similar conclusion for Dennis Greene. He served on the board of directors beginning in December 2009. He has never owned any stock in Neogenix. All of Mr. Greene's Board activities ceased when he resigned from the Board on July 2, 2012. Since that time, he has not attended any Board meeting or any Board committee meeting. Mr. Greene did not participate in the Debtor's decision to file for bankruptcy protection and he had no involvement in either the preparation or prosecution of the bankruptcy case or the formulation of the Plan. Since his resignation from the Board, the Debtor's management has not sought or considered Mr. Greene's opinion or advice on any matter. Accordingly, Mr.

Greene ceased being a statutorily defined insider upon his resignation from the Board in July

2012, and the evidence establishes that he is not sufficiently connected with the Debtor to lead

to the conclusion that he was an insider when the Plan was developed or voting occurred.

Therefore the court concludes that the Debtor has met the requirements of

§1129(a)(10).[13]

### *The Release Provision.*

The UST objects to the inclusion of the Release Provision in Article 10.  She argues that

while there is no *per se* prohibition against third party release clauses, the Release Provision is

not permissible under controlling law as applied to this case.  Neogenix and the Committee

disagree, and contend that the Release Provision is a narrowly drawn, bargained for resolution of

the Class 3 claims that is necessary for Plan confirmation.  They contend the Release Provision

substantially benefits the releasing parties because it allows the Class 5 members to receive the

PB Stock without having to wait for the statute of limitations to run on any claims against the

Class 3 members.  They contend, therefore, that the Release Provision is allowable under

established precedent.

At the core of the parties' dispute is their differing application of the Fourth Circuit's

decision in *Behrmann v. Nat'l Heritage Found. Inc. (Behrmann),* 663 F.3d 704, 712 (4th Cir.

2011) (citing *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber

Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005)).  There, the Fourth Circuit considered whether

nondebtor releases are allowable in a plan of reorganization.  The court first noted its earlier

holdings in *Menard-Sanford v. Mabey (In re A.H. Robins Co.),* 880 F.2d 694 (4th Cir. 1989), and

---

[13] Because the court concludes that Gillian M. Sorensen, the estate of Theodore Sorenson and Dennis Greene were
not insiders when the Plan was developed or voting occurred, the court need not address the Debtor's claim that
Stanley B. Archibald, Jr. and Robert Washington also were not insiders.

*Stuart v. First Mount Vernon Indus. Loan Ass'n,* 3 Fed. Appx. 48 (4th Cir. 2001), in which it held that §524(e) does not prohibit a bankruptcy court from approving a release of nondebtors under a plan.  It emphasized, however, that such releases should be granted "cautiously and infrequently" and only under "unusual circumstances."  *Id.* at 712 ("No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique.").

The court then turned to the standards a bankruptcy court should apply when considering whether to approve nondebtor releases as part of a chapter 11 plan of reorganization.  It held that whether a bankruptcy court "should lend its aid in equity to a Chapter 11 debtor will turn on the particular facts and circumstances of the case . . . ."  *Behrmann*, 663 F.3d at 711.  The court commended to the bankruptcy court for consideration the seven factors in *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning)*, 280 F.3d 648, 658 (6th Cir. 2002) and the five factors in *Hoge v. Moore (In re Railworks Corp.)*, 345 B.R. 536 (Bankr. D.Md. 2006). *Behrmann at 712*.  The *Dow Corning* court identified the following factors when analyzing nonconsensual third party releases:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;  (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) The impacted class or classes has overwhelmingly voted to accept the plan; (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and; (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

280 F.3d at 658.

The *Railworks* factors have been summarized as follows:

> (1) overwhelming approval for the plan; (2) a close connection between the causes of action against the third party and the causes of action against the debtor; (3) that the injunction is essential to the reorganization; and (4) that the plan of reorganization provides for payment of substantially all of the claims affected by the injunction.

*In re Nat'l Heritage Found., Inc.,* 478 B.R. 216, 226 (Bankr. E.D. Va. 2012) (quoting *Behrmann* 663 F.3d at 712). As has been recognized, the *Railworks* factors are "basically a shortened version" of the *Dow Corning* factors, *id.* at 227, and so the court will turn to the *Dow Corning* factors.

*1. Whether there is an identity of interests between Neogenix and Class 3 Members.*

The court finds that there is an identity of interests between Neogenix and the Class 3 members, which arises out of the indemnity agreements between the Debtor, its directors and officers. No party disputes that the Class 3 members hold valid indemnification rights against the Debtor under the Debtor's articles of incorporation, bylaws and applicable state law. In a somewhat different context of considering whether it is appropriate to stay actions against the third parties, the Fourth Circuit recognized the identity of interest between a debtor and third parties who hold indemnification

> This "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case. To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute.

*A.H. Robins v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) (quoting *GAF Corp. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 26 B.R. 405, 410 (Bankr. S.D.N.Y. 1983)). Of

course, because officers and directors often have indemnification claims, this factor is only one factor to consider, and cannot be determinative.

*2. Whether the Class 3 members have contributed substantial assets to the reorganization.*

Although Class 3 members do not contribute assets to the Debtor under the Plan, they do provide consideration that the Committee has determined to be of sufficient value to support the Release. By accepting the Plan in which they give up their indemnification rights in exchange for the releases, the Class 3 members are allowing the PB Stock to be distributed to the Class 5 interest holders upon Plan confirmation without further confirmation or claim adjudication litigation or other delay. The Committee has determined that this benefit exceeds the value of the Release.

Specifically, all Class 3 members submitted unchallenged affidavits stating that the Release Provision was a material reason they voted for the Plan, and in the absence of the third party releases, they would vote against the Plan. The absolute priority rule ordinarily would prevent the confirmation of a plan in which sales proceeds or other assets are distributed to interest holders over the objection of, and without the acceptance by, a class of creditors. The Debtor and the Committee contend that, without the consent of Class 3, the PB Stock would have to be retained until the statute of limitations runs on any potential third party claims against the Class 3 members or those claims are resolved. Thus, the Committee has determined that the expedient receipt of the PB Stock provides the Class 5 members with a benefit that exceeds the potential value, if any, of retaining claims against the Class 3 members.

The absolute priority rule "provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a] plan." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202 (1988) (citations omitted). As pertinent

17

here, the absolute priority rule is codified in §1129(b)(2)(B)(ii), which provides that unless each claimant in a dissenting unsecured class receives or retains property with a present value equal to the allowed amount of the claim, "the holder of any claim or interest that is junior to the claims of such [unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property . . . ." 11 U.S.C. §1129(b)(2)(B)(ii)).  The statutory trigger for the absolute priority rule occurs when a plan meets all of the confirmation requirements of §1129(a) "other than [§1129(a)(8)]."  11 U.S.C. §1129(b)(1).  Section 1129(a)(8) provides as a requirement for confirmation that "each class of claims or interests  (A) . . .  has accepted the plan ; or (B) . . . is not impaired under the plan."  *Id.* at §1129(a)(8).  Thus, the absolute priority rule applies where an impaired senior class has not accepted the plan and the other requirements for confirmation are met.

The UST contends that the court can confirm the Plan without providing the releases to Class 3 members because the absolute priority rule would not apply to a class made up of insiders.  The UST made this argument, which she concedes is novel, when she contended that Class 3 was fully comprised of insiders.  The court has now rejected that contention.  It is sufficient to say here that nothing in the language of §1129(a)(8) or §1129(b)(1) excepts from the reach of the absolute priority rule an impaired non-accepting creditor class merely because it is comprised primarily of insiders.[14]

---

[14] To be sure, there are several rules that apply under the Bankruptcy Code or developed by the courts when addressing insider claims in chapter 11.  The first, addressed above, is that in order to confirm a plan, if any class is impaired under the plan, the plan must be accepted by at least one impaired class without regard to the acceptance of the plan by insiders. 11 U.S.C. 1129(a)(10).  As established above, the Plan meets this requirement.  The second is that the treatment of insider claims is given a heightened level of scrutiny than that of noninsider claims.  *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 744-45 (6th Cir. 2001) (quoting *In re Fabricators,* 926 F.2d 1458, 1465 (5th Cir. 1991)).  Here, there are no allegations that the Class 3 members unduly influenced the Debtor or the Committee or otherwise overreached in their negotiated resolution of the Class 3 claims that would warrant a departure from the language of §1129(a) and (b).

The court concludes that the absolute priority rule would prevent the Plan from being confirmed if the Class 3 members were to vote against it in the absence of the releases as the case is currently presented.  Thus, the Class 3 members' relinquishment of their indemnification rights supports the determination by the Committee that the Class 5 members receive a negotiated benefit under the Plan.

3.  *Is the injunction essential to reorganization, namely, does the reorganization hinge on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the Debtor?*

The Plan is a liquidating plan; the Debtor is not reorganizing.  All of the Debtor's assets have been sold (other than litigation claims) and the Plan will not affect the operation of those assets or any reorganization effort.  Thus, the Release Provision is not essential to the Debtor's reorganization.

Further, the court assumes for purposes of this decision that the only two options available for the resolution of the Class 3 claims are those presented by the parties: either (1) the Class 3 members receive a third party release; or (2) the PB Stock and other assets must be retained by the Debtor until any third party claims against the Class 3 members are resolved or the statute of limitations has run.[15]  This assumption, however, proves too much for the Debtor and Committee.  By their admission, an alternative plan is available in this case to resolve the Class 3 claims, one in which the PB Stock is retained until the statute of limitations runs.  Thus, the Release Provision is not essential to the confirmation of a liquidating plan.

Without doubt, the Committee and the Debtor have concluded that such an alternative plan is not the *preferred* plan.  But this point simply emphasizes that what occurs under the Plan

---

[15] Other than the UST's contention that the court can confirm the Plan over the dissent of Class 3, neither the Debtor, the Committee nor the UST have addressed whether other mechanisms exist to resolve the Class 3 members' indemnity claims in the absence of the Plan releases or through an alternative plan that holds the PB Stock until the statute of limitations runs.

is a proposed settlement of the third party claims between Class 3 and Class 5.  *See In re Washington Mutual, Inc*., 442 B.R. 314 (Bankr. D. Del. 2011) (recognizing that a different standard applies for approving a settlement that includes the release of third party claims than for imposing the release on the third parties).  Because the release of the third party claims is not necessary for the Debtor's reorganization or for confirmation of a plan, this factor weighs against allowing the Release.

*4.  Has the impacted class overwhelmingly voted to accept the Plan?*

The impacted class, Class 5, voted overwhelmingly to accept the Plan.  The determination of whether a class of interests accepts a plan is made by reference to the amount of the allowed interests that vote on the Plan.  §1126(d).  By that standard, holders of 99.59% of the amount of the allowed interests that voted have accepted the Plan.  No Class 5 member has filed an objection to the Plan.  This factor weighs in favor of allowing the Release.

*5.  Does the Plan provide a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction, and does the Plan provide an opportunity for those claimants who choose not to settle to recover in full?*

The record establishes that the Committee investigated claims against the Class 3 members and concluded that the Class 5 members are better off by granting third party releases and immediately receiving the PB Stock.  Other than that, the record is largely bereft of any discussion of the nature of potential claims against the Class 3 members.  And it is not self-evident from the record why the Committee reached its conclusion.  For example, it is not clear whether any Class 3 members served during the period that the improper finders' fees were being charged, which gave rise to the rescission claims and the SEC inquiry.  The court does not doubt that the Committee and its counsel fulfilled their duties with a full understanding of their responsibilities to the estate and the Class 5 members.  The court, however, cannot conclude one

way or the other whether the Class 5 members are receiving adequate value for their claims by granting a release in exchange for the immediate receipt of the PB Stock.

It is clear, however, that the Class 5 members were not given an opportunity to choose not to provide a third party release and pursue their claims, other than to vote against the Plan. The Debtor carries substantial officer and director liability insurance. It is not inconceivable that some Class 5 members, if given the chance, might be content to have the PB Stock retained in the liquidating trust and pursue claims against the Class 3 members. Thus Class 5 members were not provided an opportunity to choose not to give a release, and the court cannot conclude that the Class 5 members receive adequate value under the Plan. These factors weigh against allowing the Release.

6.  *Discussion of factors.*

The Release Provision does not meet the requirements of *Behrmann*. The Plan is a liquidating plan. The third party releases are not necessary for the Debtor's reorganization or the sale of the Debtor's assets, which has long since closed. An alternative, albeit less preferred, plan is available to be confirmed. There is insufficient information before the court to allow it to conclude that the releases are fair and reasonable to the releasing parties. The UST also has not been provided with this information. The Class 5 members were not given a choice to opt out of the settlement and pursue their claims. Therefore, the court will deny confirmation of the Plan.

In the court's view, this case is more akin to cases that consider whether third party releases should be allowed by consent, rather than to *Behrmann*-type cases. This is because the primary factors in support of the Release Provisions are the overwhelming vote in favor of the Plan by Class 5 and the lack of objection by a releasing party. It is well recognized that, where the application of the *Dow Corning* or other applicable factors leads to the conclusion that the

third party releases should not be approved, the court can nevertheless approve the releases with the consent of the releasing parties.  The rationale for allowing consensual third party releases is that the affected parties are bound by their consensual agreement.  *See Flake v. Schrader-Bridgeport Intern., Inc.,* 538 Fed. Appx. 604, 613 (6th Cir. 2013) (Section 524 prevents a debtor's discharge from extending to third parties, but parties are free to settle claims.); *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.,* 202 F.3d 223, 228 (4th Cir. 2000) (Parties are not precluded from settling claims consensually.);  *In re Arrowmill,* 211 B.R. 497, 506 (Bankr. D.N.J. 1997) ("When a release of liability of a nondebtor is a consensual provision, however, agreed to by the effected creditor, it is no different from any other settlement or contract and does not implicate 11 U.S.C. §524(e).").  Courts differ on whether consent to third party releases must be express, such as by accepting the plan or making an affirmative statement on a plan ballot, or can be implied, such as by failure to object or opt out.  *Compare In re Washington Mutual, Inc*., 442 B.R. at 355 (holding that "[f]ailing to return a ballot is not a sufficient manifestation of consent to a third party release."); *with In re DBSD North America, Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009) (holding that creditors who abstained from voting and failed to opt out were deemed to have consented to the third party releases because the ballot contained, in bold font, notice of the release provisions and an opportunity to opt out), *judgment aff'd in part and reversed in part*, *on other grounds,*  627 F.3d 496 (2d Cir. 2010).

In this case, despite the Class 5 support for the Plan and the lack of objection by a releasing party, the consent of the Class 5 members–or at least informed consent to the release of personal claims–has not been obtained.  Even in cases that allow implied consent, the courts require adequate notice on the voting ballot that the releasing parties were giving a release and

that their abstention from voting would constitute their consent.  *In re DBSD North America, Inc.*, 419 B.R. at 218.  Nothing on the ballot here gave such notice to the Class 5 members.

**The Exculpation Provision.**

On remand from the Fourth Circuit, the U.S. Bankruptcy Court for the Eastern District of Virginia addressed the propriety of the exculpation provision in *Behrmann*.  *In re Nat'l Heritage Foundation, Inc.*, 478 B.R. at 232-34, *aff'd sub nom National Heritage Foundation Inc. v. Behrmann*, No. 12-cv-1329, 2013 WL 1390822 (E.D.Va. 2013).  The court reviewed a number of decisions that uphold exculpation provisions and recognized that "generally [exculpation provisions] are permissible, so long as they are properly limited and not overly broad."  *Id.*  at 233 (and cases cited therein).

There are several factors that lead to the conclusion that the exculpation of the Committee members and the Debtor's officers and directors who served during the case should be approved. The Committee members and the Debtor's directors have served throughout this case without compensation.  The Debtor's officers have worked without compensation since the sale closed. Thus, at no small personal cost, they have provided valuable services to the estate that were necessary for the successful sale to PB and to conclude the administration of the estate.

Further, as pertinent here, the Exculpation Provision is narrow in scope.  It is limited to post-petition actions and does not include any pre-petition claims against these parties.  An exception in the Exculpation Provision exists for claims of gross negligence and willful misconduct.  Therefore, the court will approve the Exculpation Provision as it applies to the Committee members and to the directors and officers of the Debtor who served during the bankruptcy case.

**Conclusion**

For the foregoing reasons, the Court will deny confirmation of the Plan.  A separate order will issue.

cc:     Debtor
        Debtor's Counsel
        Official Committee
        Official Committee's Counsel
        United States Trustee
        United States Trustee's Counsel

**<u>END OF MEMORANDUM</u>**