Date signed September 30, 2015



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at GREENBELT

| | | |
|---|---|---|
| In re: | * | Case No.   12-23557-TJC |
| Neogenix Oncology, Inc., | * | Chapter   11 |
| Debtor | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF DECISION

Debtor Neogenix Oncology, Inc. ("Neogenix" or the "Debtor"), with the support of the

Official Committee of Equity Security Holders (the "Equity Committee"), seeks approval of

supplemental solicitation procedures for the Debtor's plan of liquidation.  The court previously

ruled that the Debtor established all elements under 11 U.S.C. § 1129(a)[1] for confirmation of its

plan except that the third-party release provisions were not appropriate under applicable law.

*See* ECF No. 385 at 22.  Specifically, the court held that the releases of thirteen officers and

directors - the Class 3 members - given by the Class 5 shareholders would not be allowed.  The

---

[1] All references to statutory sections are to the United States Bankruptcy Code found at 11 U.S.C. §§ 101, et seq., unless otherwise noted.

court noted that there was overwhelming support for the Debtor's plan by Class 5 and no

stakeholder objected to the plan or even asserted claims against the Class 3 members, but that the

Class 5 shareholders did not receive adequate notice of the release or the opportunity to opt out

from providing the release.

Before the court is the joint motion of Neogenix and the Equity Committee seeking

approval of a supplemental solicitation (the "Supplemental Solicitation") of the Debtor's plan.

ECF No. 393.  The Supplemental Solicitation is intended to provide clear and conspicuous notice

of the releases to the Class 5 shareholders and an opportunity for them to opt out from granting a

release, while also modifying the plan to address these changes.  The modifications include a

provision that if more than 3% of the Debtor's outstanding shares opt out of the releases, then no

Class 3 member will receive a release.  The motion is opposed by Judy Robbins, the United

States Trustee for Region Four (the "UST"), ECF No. 418, the United States Securities and

Exchange Commission (the "SEC"), ECF No. 416, and various shareholders, ECF Nos. 411,

419, 426, 437, and 440.

The primary issue addressed here is whether, now that the Class 5 shareholders have an

option to opt out of giving the release, the releases of the Class 3 members given in the plan by

Class 5 shareholders who either accept the plan or do not return a ballot should be allowed.  For

the reasons set forth below, the court concludes that the releases by the Class 5 shareholders will

be allowed in those circumstances, pending a final determination after the supplemental voting

by the Class 5 shareholders.  In so ruling, the court does not approve the Supplemental

Solicitation as presented, but will approve it with the modifications provided herein.

**Facts**

Neogenix is a Maryland corporation founded in 2003 as a biotechnology company that developed diagnostic and therapeutic products for the early detection and treatment of cancers. Neogenix did not generate operating revenues; its funding came almost exclusively from grants and the sale of its common stock.

Neogenix instituted a program to sell its stock through a finders' fee program, by which brokers were compensated for selling shares. The SEC learned that unlicensed brokers were being compensated for the sale of stock, which no one disputes is a clear violation of Section 15 of the Securities Exchange Act of 1934. The SEC sent Neogenix a letter of inquiry in October 2011, seeking information about the finders' fee payments. By all accounts, Neogenix has cooperated with the SEC in its investigation. Insofar as the record shows, the SEC has not brought any action against Neogenix for the finders' fee program, and the plan expressly preserves any claims or rights the SEC has against Neogenix or any person or entity, including the Class 3 members.

Under certain circumstances, shareholders who purchased shares through unlicensed compensated brokers may be permitted to rescind their purchase and collect their investment. Neogenix thus faced potential liability from the sales through unlicensed compensated brokers, in a range estimated to be up to $31 million. No rescission litigation against Neogenix has been initiated, but Neogenix received several shareholder claims for rescission totaling an estimated $1.4 million.

These events, as well as the potential for rescission liability, jeopardized Neogenix's ability to raise new capital. Neogenix appointed a committee of directors to explore financial alternatives, and retained Piper Jaffray & Co. to investigate options to raise capital or search for a

3

buyer.  Precision Biologics, Inc. ("PB") was the only party to submit a bid for Neogenix's

operating assets.  Neogenix and PB entered into a letter of intent and then negotiated the terms of

an asset purchase agreement, a bridge loan, and a debtor-in-possession financing facility.

Neogenix filed for chapter 11 relief on July 23, 2012.  The UST subsequently appointed

the Equity Committee.  ECF No. 80.  The court approved Neogenix's bidding procedures for the

sale of its assets, but only PB submitted a qualifying bid.  The court entered an order approving

the sale to PB and the sale closed on September 24, 2012.  PB paid Neogenix $3,965,000.00,

minus a credit of $1,172,525.37 (representing a payoff of the DIP financing facility) for all of

Neogenix's assets.  The remaining $2,792,474.63 went to Neogenix, and PB issued Neogenix 5.5

million shares of PB stock (the "PB Stock") to be distributed *pro rata* to Neogenix's

shareholders pursuant to a confirmed plan.

Neogenix and the Equity Committee developed a chapter 11 plan of liquidation.  Under

the Debtor's liquidating plan as originally proposed, all unsecured claims are paid in full.[2]  The

only voting classes are Class 3 and Class 5.  Class 3 consists of thirteen former and current

directors and officers, each of whom timely filed a proof of claim for contingent, unliquidated,

and unsecured claims for indemnification.[3]  No party disputes that the Class 3 members have

valid claims for indemnification.  Under the plan, the Class 3 members give up their

indemnification claims and are released from any claims by Class 5 shareholders.  Specifically,

under Article 10.C.3, the Class 5 shareholders release the Class 3 members for all acts or

omissions prior to the effective date.  The PB Stock will be distributed to Class 5 shareholders

---

[2] The court addressed at length the provisions of the First Amended Plan in *Neogenix I* and will only summarize
them here.

[3] Nine of the Class 3 members were officers or directors at the time the case was filed; four ceased being an officer
or director by November 12, 2012.

shortly after the effective date.  Causes of action are transferred to a liquidating trust and any net recovery will ultimately be distributed to Class 5.

The vote in favor of the plan was overwhelming.  All Class 3 members voted in favor of the plan.  As to Class 5, 99.59% (13,687,227) of the voting shares voted in favor of the plan, while .41% (56,333) rejected the plan.

A confirmation hearing was held on May 2, 2013.  The court concluded that all elements of 11 U.S.C. § 1129(a) were met for confirmation other than two issues: (1) whether the plan met the requirements of § 1129(a)(10), which requires that if any class of creditors is impaired under a plan, at least one class of creditors must approve the plan without regard to the votes of insiders; and (2) whether the plan could be confirmed with the third party release and exculpation provisions.  The court resolved these issues in a Memorandum of Decision.  ECF No. 385.  *In re Neogenix Oncology, Inc. (Neogenix I)*, 508 B.R. 345 (Bankr. D.Md. 2014).  In the Memorandum of Decision the court concluded that the plan meets the requirement of 11 U.S.C. § 1129(a)(10), but further concluded that the third-party release provisions could not be approved, and denied confirmation.

The Debtor and the Equity Committee subsequently filed their joint motion to approve the Supplemental Solicitation.  They requested that the court consider the release issues raised in the joint motion prior to resoliciting a vote on the plan as a more efficient way to address the issue.  No party objected to this procedure.  Thus, for reasons that will be apparent, a final determination on the appropriateness of the third party release provisions must await the vote on the plan.  Nevertheless, the court addresses here the appropriateness of the third party releases as the case is currently postured.

**The Supplemental Solicitation.**

The Debtor and the Equity Committee propose to modify the treatment of Class 3 and Class 5 with a corresponding modification of the plan that reflects the proposed changes, and to re-solicit supplemental ballots to Classes 3 and 5.  They state that, in response to the ruling in *Neogenix I* and objections raised by the UST and the SEC, they formulated what they term to be "a practical and comprehensive  business solution" that seeks to resolve the indemnification rights of the Class 3 members and provides a mechanism for the distribution of  the PB Stock to the Debtor's Class 5 shareholders at the discretion of each individual Class 5 shareholder.

As presented, the Supplemental Solicitation, including the corresponding modification of the plan, would operate as follows:

1) The members of both Class 3 and Class 5 would be re-solicited;

2) The supplemental ballots for Class 5 would be amended to contain three boxes which could be checked by the voters as follows:

(i) a box indicating acceptance of the amended plan,[4]

(ii) a box indicating rejection of the amended plan, and

(iii) a box indicating that the voter is opting-out of the release of Class 3 members.

3) The supplemental ballots for Class 5 will clearly and conspicuously put the voters on notice of the following ramifications of their votes or of their failure to return a supplemental ballot:

(i) A vote to accept the amended plan constitutes consent to the release of the Class 3 members;

---

[4] As proposed, if a voter accepts the plan, he or she would not be permitted to also opt-out of the release of Class 3 members.

(ii) A vote to reject the amended plan, but not checking the opt-out box, constitutes consent to the release of the Class 3 members;

(iii) An unmarked supplemental ballot, without checking the opt-out box, constitutes consent to the release of the Class 3 members;

(iv) A failure to return the supplemental ballot constitutes consent to the release of the Class 3 members;

(v) A supplemental ballot which does not vote to accept or reject the amended plan but which checks the opt-out box, constitutes a rejection of the release of the Class 3 members;

(vi) A vote to reject the amended plan and checking the opt-out box constitutes a rejection of the release of the Class 3 members.

4) If 3% or less of the Debtor's outstanding shares of stock opt-out of the release of the Class 3 members, then those Class 5 interest holders who have consented to the releases would promptly receive their *pro rata* share of the PB Stock following the effective date of a confirmed plan.

5) Any Class 5 interest holder who properly returns a supplemental ballot and checks the opt-out box would have their *pro rata* share of PB Stock held in escrow in the liquidating trust and such stock would be available to the liquidating trustee in the first instance to satisfy any potential remaining indemnification obligations that may arise with respect to the Class 3 members as a result of their having received either incomplete releases or no releases under the amended plan until the "Indemnification Period"[5] expires.[6]

---

[5] The term "Indemnification Period" is not adequately defined in the joint motion. The Debtor and Equity Committee must submit a clear definition of the term prior to the resolicitation of Classes 3 and 5.

7

6) If more than 3% of the Debtor's outstanding shares of stock opt-out of the release of the Class 3 members, then <u>all</u> of the PB Stock will be held in escrow in the liquidating trust until the Indemnification Period expires in order for such PB Stock to be available to the liquidating trustee to satisfy any indemnification claims of Class 3 members. In other words, the Class 3 members will retain their indemnification rights and the releases would not be effective.

7) If any one Class 5 interest holder opts-out of the release of the Class 3 members, then all of the net litigation proceeds will be held in escrow in the liquidating trust until the "Indemnification Period" expires in order for such net litigation proceeds to be available to the liquidating trustee to satisfy any indemnification claims of Class 3 members, as applicable. If more than 3% of the Debtor's outstanding shares of stock opt-out of the release of the Class 3 members, then the Liquidating Trustee shall first use the net litigation proceeds to satisfy any indemnification claims of Class 3 members, before selling the PB Stock to satisfy such claims.

### Conclusions of Law

No party disputes that a court can confirm a plan that provides third party releases given with the express consent of the releasing party. The parties disagree over whether the court can approve a plan that provides releases with the "implied consent" of the releasing parties, that is, where a releasing party receives notice that it is giving a release under the plan, is given the

---

[6] The proposal provides that if the PB Stock being held in escrow due to one or more Class 5 interest holders opting-out of the releases cannot be monetized to satisfy any Class 3 indemnification claims, then such opting-out Class 5 interest holders' *pro rata* shares of the net litigation proceeds shall be used to satisfy such obligations. If those net litigation proceeds are insufficient to satisfy any Class 3 indemnification claims, then the Liquidating Trustee shall use the remaining net litigation proceeds that would ordinarily be allocated for distribution to the other Class 5 interest holders who consented to the releases of the Class 3 members to satisfy such obligations.

opportunity to opt out of providing the release, and does not opt out.  The parties also disagree over the necessary level of affirmation necessary to obtain express consent – whether a vote in favor of a plan by the releasing party is sufficient, or whether the releasing party must also give express approval of the release in addition to an affirmative vote for the plan.

In the Fourth Circuit, the legal principles governing nonconsensual third party releases in a plan of reorganization are now well established.  *See Behrmann v. Nat'l Heritage Found., Inc. (Behrmann),* 663 F.3d 704 (4th Cir. 2011) and *Nat'l Heritage Found., Inc. v. Highbourne Foundation*, 760 F.3d 344 (4th Cir. 2014).  In *Behrmann*, the court considered whether nondebtor releases are allowable in a plan of reorganization.  It held, consistent with its earlier decision in *Menard-Sanford v. Mabey (In re A.H. Robins Co.),* 880 F.2d 694 (4th Cir. 1989), that bankruptcy courts may approve releases of nondebtors under a plan.  It emphasized, however, that such releases should be granted "cautiously and infrequently" and only under "unusual circumstances."  *Behrmann*, 663 F.3d at 712 ("No case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique.").  *See also In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002); *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203 (3d Cir. 2000).  The determination of whether to approve the third party release will depend on the particular facts and circumstances of a case, and the Fourth Circuit in *Behrmann* commended to the bankruptcy courts for consideration the seven factors in *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning)*, 280 F.3d 648, 658 (6th Cir. 2002) and the five factors in *Hoge v. Moore (In re Railworks Corp.)*, 345 B.R. 536 (Bankr. D.Md. 2006).  *Behrmann*, 663 F.3d at 712.  The court emphasized the need for the bankruptcy court to consider fully the pertinent factors of a case and to identify on the record the rationale for its determination.  *Id*. at 711.

9

The Fourth Circuit has not expressly faced the issue presented here, whether a "consensual" third party release must be express or whether implied consent can be sufficient. Many courts have addressed this issue.  No consensus exists.

A number of courts conclude that the validity of the release hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation. Therefore, in those courts, individual affirmative consent is required.  *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) (creditor must have "unambiguously manifested assent to the release of the non-debtor from liability on its debt."); *In re Arrowmill Development Corp.,* 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (holding it was "not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' to a plan.").

Other courts are in conflict over whether implied consent is sufficient evidence for a court to determine a release was consensual. Courts traditionally held that the creditor must individually consent by voting in favor of the plan. *See In re Washington Mutual Inc.*, 442 B.R. 314, 355 (Bankr. D.Del. 2011) (finding the opt-out mechanism in the plan insufficient to support the third-party releases, especially in regards to the parties who did not return a ballot); *In re Coram Healthcare Corp.*, 315 B.R. 321, 336 (Bankr. D.Del. 2004); *In re Zenith Elec. Corp.*, 241 B.R. 92, 111 (Bankr. D.Del. 1999). *See also Matter of Specialty Equip. Co., Inc.*, 3 F.3d 1043, 1044-49 (7th Cir. 1993) (holding that third-party releases binds only those creditors voting in favor of the plan).

Other courts have allowed failure to return a ballot to constitute a third-party release when the creditor had received notice of the ramifications of releasing parties. *See In re Indianapolis Downs, LLC.*, 486 B.R. 286, 305 (Bankr. D.Del. 2013); *In re Spansion, Inc.*, 426 B.R. 114, 144-45 (Bankr. D.Del. 2010).  Most recently, in *Indianapolis Downs*, the Trustee

10

relied on *Washington Mutual* to argue that the third-party release was unenforceable without

affirmative consent.  *In re Indianapolis Downs, LLC.*, 486 B.R. at 305.  However, the court

determined that there was "no such hard and fast rule" and the "deemed" acceptance by the

unimpaired creditors was permissible because "those creditors are being paid in full and have

therefore received consideration for the releases."  *Id.*

Two decisions in the Southern District of New York have allowed implied consent

releases when there was adequate notice on the voting ballot that the releasing parties were

giving a release and the releasing parties were given an opportunity to opt out of the release.  *In

re DBSD North America*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009); *In re Calpine Corp.*,

2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007); *see also In re Conseco, Inc.*, 301 B.R. 525,

528 (Bankr. N.D.Ill. 2003) (holding a release provision binding on impaired creditors who

abstained from voting on the plan and did not otherwise opt out to be implied consent).  *See also

In re U.S. Fidelis, Inc.*, 481 B.R. 503, 517 (Bankr. E.D.Mo. 2012) (holding that a vote to reject

the plan was not per se refusal to consent to a third party release and required creditors to file an

objection).

Here, not surprisingly, the plan proponents ask the court to adopt the rationale of those

courts that allow consensual releases in the absence of express consent.  The objecting parties

rely on those cases that hold that a vote in favor of the plan, or some other form of express

affirmation of the release, is necessary to approve a consensual release.

The court concludes that it need not adopt either side of the debate as framed.  This is

because *Behrmann* provides sufficient guidance on whether a court should approve a release for

which there is insufficient affirmation of consent, whether the release is said to be

"nonconsensual" or based on "implied consent."  Indeed, one of the specific factors that

*Behrmann* commends to bankruptcy courts for consideration is whether the releasing party was given the opportunity to opt out of the release. It is a matter of semantics to say that a release is given by "implied consent" where the releasing party has the right to opt out but does not do so, as compared to saying a release is "nonconsensual" under the very same facts. Stated otherwise, while the opportunity for the releasing party to opt out of the release is an important factor to consider under *Behrmann*, nothing in that decision suggests it is the only or overriding factor.

Under this view, the principles of *Behrmann* apply. Thus, the approval of releases in the absence of a vote in favor of a plan or some other express affirmation of consent should be allowed "cautiously and infrequently" and only under "unusual circumstances." *Behrmann*, 663 F.3d at 712. The determination will depend on the facts and circumstances of the case, and the task of the bankruptcy court is to consider fully all relevant factors and explain its decision. *Id.* at 712-13. The same factors that *Behrmann* commends to the bankruptcy courts for consideration of "nonconsensual" releases should be considered for "implied consensual" releases as well.

Turning to the more specific *Behrmann* factors, this court addressed them at length in *Neogenix I. Neogenix I,* 508 B.R. at 357-61. There, the court denied confirmation of the plan because the "Class 5 members were not given a choice to opt out of the settlement and pursue their claims." *Id.* at 361. The court also noted that the Equity Committee investigated claims against the Class 3 members and concluded that the releases by the Class 5 shareholders were in their best interest, but did not provide sufficient information about the value of the potential claims being released. Notwithstanding the denial, the court found that a number of the *Behrmann* factors weighed in favor of approving the releases and confirming the plan. First, the court found an identity of interests between the Debtor and the Class 3 members, which arose out

of the indemnity agreements between the Debtor, its directors and officers. *Id.* at 357. Second, the court found the Class 3 members' relinquishment of their indemnification rights supported the determination by the Equity Committee that the Class 5 shareholders received a negotiated benefit under the plan, and therefore sufficient value was provided to support the release. *Id.* at 359. Finally, the impacted class, Class 5, voted overwhelmingly to accept the plan. The plan was accepted by holders of 99.59% of the amount of the allowed interests that voted. No Class 5 shareholder filed an objection to the plan; the only objecting party to the plan was the UST. *Id.* at 360. No party had brought claims against the Class 3 members, nor had any party even asserted claims against the Class 3 members.

In the court's view, the addition of the opt-out provision for the Class 5 shareholders, coupled with the additional testimony by the Equity Committee concerning the value, or lack thereof, of claims against the Class 3 members, as well as the *Behrmann* factors identified in *Neogenix I*, lead to the conclusion that the Supplemental Solicitation should be approved, as amended below. The opt-out provision allows any Class 5 shareholders who do not wish to give a release the right to opt out of giving a release and pursue whatever claims they may hold against Class 3 members. Thus no Class 5 shareholder who does not wish to give a release will be required to do so.

Further, the lynchpin to approval of the Supplemental Solicitation is the role of the Equity Committee. The Equity Committee, represented by competent counsel, has a fiduciary duty to protect the interests of the Class 5 shareholders. The Equity Committee conducted a thorough analysis and investigation of the potential causes of action arising out of the finders' fee transactions. The scope of the Equity Committee's investigation into claims against officers

13

and directors was addressed in *Neogenix 1*, 508 B.R. at 351-52, and was amplified at the hearing on the current motion.

The Equity Committee concluded that claims exist against certain former officers and directors of Neogenix, as well as potentially against former professionals. It anticipates that claims will be brought against these parties that could lead to a monetary recovery to be disbursed to the Neogenix interest holders. It took care to ensure that these claims are preserved under the plan.

The Equity Committee also concluded that the release of the Class 3 members was – in the words of its Chairman – a "no brainer" in order to enable the Class 5 shareholders to receive the benefits under the plan. At the hearing on the joint motion, the Equity Committee presented the testimony of Cullen Seltzer, Esq., who is an attorney with Sands Anderson, the firm that represents the Equity Committee, and is part of the Business and Professional Litigation practice group. Mr. Seltzer actively participated in evaluating potential claims against the Class 3 members on behalf of the Equity Committee. He testified that after completing the investigation, it was determined "without dispute or equivocation" that the Class 3 members were not advised by their legal counsel, who was present at the board meetings, and were not aware, that there was anything problematic or impermissible about the way Neogenix was raising money.

Mr. Seltzer further testified that his investigation led him to conclude that it was "abundantly clear" that the Class 3 members were appropriately and actively engaged in the management of the Debtor. Despite the active role that the Class 3 members played, there was no indication that any conversation or discussion occurred about the possibility that the unlicensed compensated finders might have run afoul of SEC regulations, and as a result, the possibility that some shareholders may be able to rescind their investment. It also became clear

14

that as soon as the Class 3 members learned of the potential problem they reacted with "alacrity" and "alarm" and sought to immediately redress the situation.  After the investigation concluded, Mr. Seltzer advised that a claim against the Class 3 members would be extremely difficult and unlikely be successful, and therefore, recommended that any such claim should not be pursued.  The Equity Committee gave substantial consideration to this analysis and conclusion in assisting the Debtor in the creation of the plan.  Thus, while the Equity Committee has stated it respects the principled views of the UST and the SEC, it vigorously disputes that hypothetical concerns about releases of unstated and unasserted claims should prevent it from proceeding with the plan it believes is in the best interest of Class 5.

The court gives substantial weight to the position taken by the Equity Committee.  It does not do so blindly, however.  The Equity Committee's conclusions are supported by the circumstantial evidence before the court.  As stated above, the Class 5 vote was overwhelmingly in favor of confirmation.  No party has yet to file a lawsuit against the Class 3 members, either before or since the petition was filed on June 23, 2012, and the court is not aware that any formal claim has even been asserted against them.  Other than after the plan was first solicited and the Class 5 shareholders voted overwhelmingly to approve the plan, no Class 5 shareholder filed a formal or even informal objection to the plan.

Moreover, as described above, the Supplemental Solicitation includes a modification to the plan that results in different treatment for Class 5 if 3% or less of the outstanding shares opt-out of the release of the Class 3 members, than if more than 3% of the outstanding shares opt out.  If more than 3% of the Debtor's outstanding shares of stock opt out of the release of the Class 3 members, then the Class 3 members will retain their indemnification rights and the releases would not be effective.  The relatively low threshold of 3% of the shares ensures that the Class 3

15

members will only receive releases if an overwhelming percentage of the outstanding shares do not reject the release provisions.

At its core, Chapter 11 provides tools, governed by specific statutory, procedural and judicial rules to be sure, but designed to provide sufficient flexibility so parties can determine the most cost-effective manner of enhancing value for stakeholders.  In a unique and appropriate case, the use of third party releases is included in those tools.  In the view of the Equity Committee, the best and most cost-effective way to address the Class 3 members' indemnification rights is through the plan as modified by the Supplemental Solicitation, giving individual Class 5 shareholders the right to opt out if they choose, but allowing what is anticipated to be an overwhelming majority of Class 5 shareholders the opportunity to take their PB Stock and move on.

The court concludes that, subject to final determination after the results of supplemental voting by Class 5 are known, the release provision will be allowed for Class 5 shareholders who do not return a ballot, provided they receive clear and conspicuous notice that they are providing a release under the plan as well as clear and conspicuous notice that they have the right to opt out of the release.

The foregoing does not end the matter.  As stated above, under the Supplemental Solicitation, if more than 3% of the Debtor's outstanding shares of stock opt-out of the release, then the Class 3 members will retain their  indemnification rights and the releases would not be effective.  In light of the above discussion, the court concludes that a Class 5 shareholder who does not return an approved ballot will be considered to have accepted the release for purposes of determining the percentage of outstanding shares that accept or reject the release.  The parties

16

differ on what constitutes an acceptance or rejection of the release on the supplemental ballot under other voting scenarios.

The Debtor and Equity Committee contend that an affirmative vote in favor of the plan, coupled with clear and conspicuous notice that the Class 5 shareholders are providing a release, constitutes consent to the release for purposes of achieving the 3%. Some of the objecting parties argue that a vote in favor of the plan is not sufficient; each Class 5 shareholder must also affirmatively agree to the release. Here again, however, there is "no … hard and fast rule." *In re Indianapolis Downs, LLC.*, 486 B.R. at 305. Under the unique facts of this case, the court has no trouble concluding that a vote in favor of the plan by a Class 5 shareholder constitutes sufficient acceptance of the release for purposes of determining whether the 3% threshold is met. Other than the Class 3 members who receive the releases, the Class 5 shareholders are the only parties who vote on the plan. No creditors exist or are included in the plan, so there is no risk of confusion among different class treatments. The plan presents the Class 5 shareholders with a single question – do they wish to resolve the Class 3 members' indemnification claims by providing a release, or do they prefer not to provide a release and address those claims in some other fashion. Since the essential question presented to the Class 5 shareholders is whether they wish to provide a release or opt out of the release and address the indemnification claims otherwise, a vote in favor of the plan constitutes sufficient agreement to provide the release. To require more would render the vote on the plan superfluous.

For the same reason, it is self-evident that a vote against the plan is a decision against providing the release, even if the opt-out box is not checked. Thus the court rejects the Debtor's request that a vote to reject the plan but not checking the opt-out box is an acceptance of the release. And, of course, there is no doubt that making the election to opt out of the release

expresses the decision to not provide a release. Next, the Debtor argues that a ballot that accepts the plan but opts out of the release should be treated as an acceptance of the release. The court disagrees. While it seems inconsistent for a Class 5 shareholder to vote in favor of the plan but nevertheless elect to opt out of the release, the specific opt-out election must control. Thus a ballot that votes in favor of the plan but opts out of the release will be considered an election to reject the release for purposes of determining whether the 3% threshold is met. Finally, an unmarked ballot will not be counted as a rejection or acceptance of the plan or release.

### Conclusion

For the foregoing reasons, the court will approve the Supplemental Solicitation, modified as follows for purposes of determining the 3% of acceptance or rejection of the release by the Class 5 shareholders:

> (i) A vote to accept the amended plan will be counted as an acceptance of the release for purposes of determining the percentage of outstanding shares that accept or reject the release, provided the opt-out box is not checked;
>
> (ii) A vote to reject the amended plan, whether or not the opt-out box is checked, will be counted as a rejection of the release for purposes of determining the percentage of outstanding shares that accept or reject the release;
>
> (iii) A failure to return the supplemental ballot shall be counted an as acceptance of the release for purposes of determining the percentage of outstanding shares that accept or reject the release;
>
> (iv) A supplemental ballot that does not vote to accept or reject the amended plan but on which the opt-out box is checked, will be

counted as rejection of the release for purposes of determining the

percentage of outstanding shares that accept or reject the release; and

(v) An unmarked supplemental ballot, without checking the opt-out

box, will not be counted as a rejection or acceptance of the plan and

will not be counted as acceptance or rejection of the release for

purposes of determining the percentage of outstanding shares that

accept or reject the release.

cc:   Debtor
      Debtor's Counsel
      Official Committee
      Official Committee's Counsel
      United States Trustee
      United States Trustee's Counsel

**END OF MEMORANDUM OF DECISION**